LIEBER, Respondent, v. THE FOURTH NATIONAL BANK OF ST. LOUIS, Appellant.

St. Louis Court of Appeals.    Opinion Filed March 23, 1909.

1. BANKS: Account Stated: Forgery: Practice. In an action against a bank, by a depositor for amounts paid out by the bank on forged endorsements of the plaintiff's checks, it was alleged and shown in defense that the plaintiffs pass book was balanced and his checks, including those on which the indorsements were forged, returned to him long before and no objection made thereto; the plaintiff could challenge the payment of the checks by showing the forgery without resorting to a court of equity to attack the account stated.

2. ————: ————: ————: Negligence: Estoppel. And in such case, although the depositor may have been negligent in not discovering the forgery of the indorsement upon his checks, this would not estop him to sue for the amounts paid on the forged indorsements, where such negligence did not cause special damage to the bank.

3. ————: Forgery: Witnesses: One Party Dead. In an action against a bank for sums paid by the bank upon forged indorsements of the plaintiff's checks, the real payees of the checks were not incompetent witnesses on the ground that they were privies in contract with the forger who was dead at the time of the trial.

4. ———: ———: Negligence. Where a depositor drew a check on his bank and sent it to a distant town for the purpose of making a loan to a resident of that town and the agent conducting the negotiation forged the name of the borrower, the payee, and cashed the check, and the maker of the check was not acquainted with the signature of the payee and knew nothing of him, and there was nothing in the circumstances to arouse suspicion that the agent was not acting in good faith, the depositor was not negligent in waiting five years to make demand on the bank for a correction of his account by crediting it with the amount paid out on the forged check, although his pass book was balanced up and the check returned to him promptly.

5. PRACTICE: Demand. A demand was not necessary before bringing a suit, where it was shown that such demand would have been unavailing.

Appeal from St. Louis Circuit Court.—*Hon. Jesse A. McDonald,* Judge.

AFFIRMED.

*P. H. Cullen, Thos. T. Fauntleroy* and *Shepard Barclay* for appellant.

(1) After plaintiff, with full knowledge of the facts retains the fruits and proceeds of the acts of his agent, he cannot repudiate the other acts or features of the transaction wherein the agency existed. The delivery of the check to create the loan is part of the transaction. This rule of law, we believe, is lost sight of in the learned opinion, which does not treat the question of estoppel, at all. Green v. Bank, 128 Mo. 559; Menkens v. Watson, 27 Mo. 163; Gaines v. Miller, 111 U. S. 395; Human v. Cuniffe, 32 Mo. 316; Dow v. Spenney, 29 Mo. 390; Bank v. Lumber Co., 60 Mo. App. 255; Bank v. Lumber Co., 102 Mo. App. 83 (K. C.) (2) The depositor plaintiff owes to the bank the duty of reasonable diligence to discover such forgery and fraud as

his own agent perpetrated, and his fault in letting nearly five years pass without inquiry, on the peculiar facts which documents in his possession disclosed or clearly pointed to, was negligence and laches most pronounced. Young v. Grote, 4 Bing. 253; 23 Law Quart. Rev. 390. (3) The accounts stated in the pass-books of the bank for many years were binding and *conclusive* unless impeached or surcharged for fraud or mistake by proceeding in equity; and the following decisions are in conflict with the learned opinion herein on that point: City v. Gas Co., 11 Mo. App. 55; Pickel v. Assn., 10 Mo. App. 191; Shepard v. Bank, 15 Mo. 143; Aultman v. Connors, (Wis.), 99 N. W. 904; Poppell v. Culpepper (Fla.), 47 So. 351; Baker v. Biddle, 1 Bald. 418 (2 Fed. Cas. 764). (4) The plaintiff's witnesses Bedford and Hawkins (payees in the checks) were incompetent under the statute as Penn was *dead;* the latter was endorsee from those witnesses, and his claim of title to the check and its proceeds came from the endorsements concerning which they were allowed to testify against defendant's objections. That ruling and the learned opinion confirming it are contrary to the statute and to interpretation thereof by our Supreme Court and other courts of high authority. Angell v. Hester, 62 Mo. 142; Nowack v. Berger, 133 Mo. 24; O'Bryan v. Allen, 108 Mo. 231; Scott v. Riley, 49 Mo. App. 251; Jones v. Burden, 56 Mo. App. 199; Lewis v. Weisenham, 1 Mo. App. 222; Sutherland v. Ross, 160 Pa. St. 29, 28 Atl. 437; Hoag v. Wright, 174 N. Y. 36, 66 N. E. 579 (Note); Tillman v. Rayner, 109 N. Y. Supp. 443; Mills v. Davis, 113 N. Y. 243, 21 N. E. 68.

*Lee W. Sale* for respondent.

STATEMENT.—Plaintiff in this action, respondent here, brought suit against the defendant, now appellant, to recover the sum of $2,000, paid out by defendant on checks of $1,000 each, drawn by plaintiff, it being averred

that the signatures of the payees had been forged. There is practically no controversy over the facts, either as stated in the pleadings or developed by the testimony.

It appears that on the fifth day of July, 1900, the plaintiff transmitted by mail to one J. R. Penn, at Fulton, Missouri, a check drawn by plaintiff on the Fourth National Bank for $1,000, to the order of one G. W. Hawkins. On the ninth of July, 1900, the check was paid by the defendant, the Fourth National Bank, to the last indorsee and then holder, National Bank of Commerce, at St. Louis, and the amount charged to plaintiff, who was a depositor and customer of defendant. This check, with its successive indorsements, is as follows:

"No. 235. St. Louis, July 5th, 1900.
"FOURTH NATIONAL BANK OF ST. LOUIS..
Cor. 4th & Olive Sts.
"Pay to the order of G. W. Hawkins, One thousand 0|100 Dollars. $1,000.00.
"ARTHUR LIEBER."

Endorsed as follows:
"G. W. HAWKINS.
"PENN & SALLEE.
"Pay National Bank of Commerce, St. Louis, Mo., or order.
"COMMERCIAL BANK OF FULTON,
"P. S. ADAMS, Cashier.
"St. Louis Clearing House, National Bank of Commerce in St. Louis, July 9, 1900."

Afterwards, on August 26th, plaintiff mailed to the same man, J. R. Penn, at Fulton, another check drawn by him on the defendant bank, to the order of one Robert L. Bedford, which was paid by the defendant on the fourth of September, 1902, and the amount of it

137 App.—11

charged against the plaintiff in his account with the bank. That check, with its successive indorsements is as follows:

"No. 332.                                    St. Louis, Aug. 26th, 1902.

"FOURTH NATIONAL BANK OF ST. LOUIS,

"Cor. 4th & Olive Sts.

"Pay to the order of Robt. L. Bedford, One Thousand no 1|100 Dollars.                              $1,000.00

ARTHUR LIEBER."

Endorsed as follows:

"Pay to the order of J. R. Penn.

"ROBT. L. BEDFORD.

"J. R. PENN.

"Pay to the order of The Mechanics' National Bank, St. Louis, Mo.

"The CALLAWAY BANK, Fulton, Mo.

"E. W. GRANT, Cashier.

"Sep. 4, 1902.

The MECHANICS NATIONAL BANK.

"St. Louis Clearing House."

It thus appears that the check for $1,000 to the order of G. W. Hawkins, purporting to have the indorsement of G. W. Hawkins, followed by the indorsement of Penn & Sallee, had either been deposited with the Commercial Bank of Fulton by Penn or Penn & Sallee, or cashed by that bank on the indorsement of Penn & Sallee, and that after indorsement of the Commercial Bank of Fulton to the order of the National Bank of Commerce, in St. Louis, had been put through the clearing house at St. Louis, for account of the National Bank of Commerce, in St. Louis, and taken up through the clearing house by the Fourth National Bank. The check of August 26th, it appears was endorsed and deposited or cashed by Penn after the purported endorsement of Bedford, in the Callaway Bank, at Fulton, endorsed by that bank to the order of the Me-

chanics' National Bank, at St. Louis, Mo., and put through the clearing house at St. Louis by the latter bank, to the account of the Fourth National Bank by which it was taken up. At the time these two checks were paid, plaintiff had ample funds to meet them on deposit with the defendant bank. From the time of the payment of the first check, in July, 1900, down to June 11, 1905, the defendant bank had balanced plaintiff's account with it on his pass book, and in due course and in accordance with the usual practice between banks and their customers, had returned to plaintiff the checks with which his account had been charged, along with the balanced pass book. Thus, through the year 1901, plaintiff's account was balanced down to four different dates, in 1902, to five different dates, in 1903, to four different dates, in 1904, to four different dates, generally to January, March or April, June or August, September or November, and in 1905 it was balanced down to April eighth and June eleventh. On each occasion the pass book showed a balance to the credit of plaintiff, and in 1901, as well as in 1902, that balance struck covered the amount called for by these two checks, showing that they had been paid, and these two checks were returned to plaintiff at the time the account was balanced, along with his other checks paid during the same period.

It appears from the evidence in the case that this J. R. Penn with one Sallee, was carrying on an abstract, insurance and real estate loan and sale business, at Fulton, in Callaway county, during these periods, and had been doing so for some years prior to 1900, he and Sallee doing business as partners under the name of Penn & Sallee. The plaintiff in the case, a pianist and organist at one of the churches in St. Louis, had been in the occupation of a music teacher, pianist and organist for about eighteen years, in the course of which occupation he had saved up some money which he was desirous of loaning out on farms. His attention being called to Penn as a reliable man, he wrote to Penn in-

quiring whether he could make loans for him in that part of the country. Plaintiff had no personal acquaintance with him nor any transactions with him other than by correspondence and the letters from Penn to plaintiff are in evidence. When Penn informed Lieber that he had secured opportunities to place loans, and Lieber accepted, Penn sent him by mail what purported to be an abstract of the title to the land on which the loan was proposed to be made, bringing the abstract down to cover the proposed deed of trust securing the loan, sending with the abstract the note and deed of trust. These abstracts were certified by Penn. Upon receiving the abstract, plaintiff transmitted to Penn the check for the amount of the loan. The first one in the case, it will be remembered, was dated July 5, 1900, payable to the order of G. W. Hawkins; the second one dated August 26, 1902, to the order of Robt. L. Bedford. We have said that the notes and deeds of trust were transmitted to plaintiff before he sent the checks; it is not very clear, however, whether the transmittal of the checks proceeded or followed the receipt of the notes and deeds of trust, and is not very material. At all events, plaintiff received the deeds of trust and the notes, along with the abstracts purporting to show the recording of the deeds of trust. One of the notes purported to be signed by Hawkins, one by Bedford; the deeds of trust purporting to be signed and acknowledged by the parties and their wives, Penn certifying to the acknowledgments. Thereafter Lieber received $35 interest on each loan every six months—the loans bearing seven per cent interest—regularly until July 5, 1905. Whether this interest came to him through J. R. Penn or Penn & Sallee is not clear. On the fourth of July, 1905, plaintiff saw an account in the newspaper of the suicide of Penn, who died by his own act on the third day of that month. Apparently the notice made such reference to Penn's transactions as to excite the suspicion of Lieber. Thereupon he sent his attorney, Mr. Lee Sale, to Fulton, to

inquire into the matter of the suicide of Penn and the
reports as to its cause, and the attorney appears to have
then learned of the reports which were current, and of
his having committed suicide on account of the exposure
of forgeries which seem to have come to light about
that time. On the return of Mr. Sale from Fulton, he
went to the defendant bank and in a conversation with
the president of the bank informed the latter that Penn
had committed suicide, showed him four checks which
he had, including the two checks in suit, informed the
president of defendant that he had been to Fulton, had
just returned, had examined the records there and while
he found the seal of the record to be genuine on the deeds
of trust, had found that the deeds of trust were not re-
corded in the books at the pages mentioned on the backs
of the deeds of trust, told him he had investigated this
matter in Fulton, had spoken to people there, had showed
them the signatures and was satisfied from what he had
heard there and his investigations, that the deeds of
trust and the notes and endorsement of the names of the
payees on the checks were forgeries, and that his client,
Lieber, would look to the bank for payment and would
probably have to sue the bank; to which the president
of the defendant bank said that it would not be necessary
to sue, all that would be necessary for Lieber to do
would be to get affidavits that these signatures were
forgeries and under the rules of the clearing house the
bank must refund the money. The attorneys for plaintiff
assumed and acted on the belief that the five year statute
of limitation ran in an action of this kind. That being
so the five year statute would have run against the Haw-
kins check on the ninth of July, 1907, and acting on this
impression they accordingly commenced this suit for
Lieber on the eighth of July, although not having then
received the affidavits demanded. When the affidavit
was received from Hawkins, denying that he had en-
dorsed the check and before an affidavit had been pro-
cured from Bedford, the five year statute would have

run against the Hawkins' check.  At any rate, plaintiff or his attorney did not receive the affidavit of Hawkins until late in July and did not procure that of Bedford until sometime afterwards.  When he received the latter he presented it to the president of defendant who said that they had concluded to contest the matter.  This was after the action had been commenced.

The answer of the defendant set up the fact of the balancing of the pass book, its return, accompanied by the checks on the several periods during the intervening years from 1901 down to 1905, to plaintiff, and claimed that the effect of the return of the pass book with the account balanced and of all the checks to plaintiff, constituted an account stated.  The reply was a general denial.

At the trial the plaintiff testified that all his relations and transactions with Penn were by letter.  He produced and introduced such letters as he had, also the deeds of trust, abstracts, notes and checks.  The depositions of Hawkins and Bedford were taken and read in evidence for plaintiff.  Each of them swore in the most positive manner that they had had no transaction whatever with Penn, had never borrowed this money through him, had never known or heard of plaintiff, had never signed the notes or deeds of trust, never acknowledged them, never saw or endorsed the checks, nor authorized any one to do so for them.  There was some slight evidence by other parties to the effect that the signatures of Hawkins and Bedford on the checks resembled the handwriting of Penn.

On its own behalf the principal, practically the only testimony offered by defendant, outside of the pass books, these however, it being stipulated and agreed, having been received at each balancing date, was to the effect that prior to his suicide on July 3, 1905, J. R. Penn was in good credit, financially, according to reputation was amply able to have paid these two checks, if repayment had been demanded of him, either out of his own means

or from money that his credit would have enabled him to raise from friends or from banks in Fulton, and that while some rumors had started directly prior to his suicide, his general reputation in the community immediately preceding his suicide and for that matter through his whole life, was of the very highest character.

At the trial defendant raised the point that plaintiff was precluded from opening up the account in an action at law and could only do so in a suit in equity. Objection was also made to plaintiff or Hawkins and Bedford testifying, on the ground that J. R. Penn was a party to the contract, and being dead, these witnesses being also parties to it, were under the disabilities of the statute and barred from testifying. Due and proper objections were made throughout the trial, to the admission of testimony contrary to these contentions; the point also being made that no demand for repayment of the money evidenced by the checks having been averred, and no averment made of a tender of the checks to the bank, that not only no testimony could be received to that effect but that the petition, in failing to aver a demand of payment and of a tender of the checks, stated no cause of action. At the close of the trial the defendant asked a peremptory instruction that plaintiff was not entitled to recover, which was refused, and exception duly saved. Defendant then asked the court to give seven declarations of law, all of which the court refused, and to which refusal exception was duly saved. One or more of the declarations of law asked and refused were substantially to the effect that if, on the 30th of August and the 1st of November, 1902, the defendant had balanced plaintiff's account, returning to him his pass book, showing what sums had theretofore been paid out and charged to his account, and showing a balance in his favor, arrived at by deducting these checks, and had returned these checks to him, in that case the account became an account stated, and plaintiff could not maintain the action at law, and the judgment

should be for the defendant. Another declaration of law asked and refused was to the effect that if the defendant returned plaintiff's checks to him, among them being the checks sued on, and that with the checks were returned plaintiff's pass book with defendant bank, showing what balances he had at the time his checks were returned to him, and plaintiff kept his checks and passbook for two years, "without making any objection to the same, that his account with the bank became an account stated." Another of the refused declarations was to the effect that before plaintiff could recover herein he must have delivered or tendered the checks in question to the defendant, and such delivery or tender must have been pleaded by plaintiff in his petition. Another was that, before he could recover, plaintiff must have delivered or tendered the checks in question back to the defendant. Another declaration asked and refused was that the plaintiff is disqualified as a witness to testify in the case to any conversations or communications which he had with or had sent to Penn. Finally, a declaration was asked to the effect that plaintiff is an interested party, and, Penn being dead, he is disqualified as a witness to testify in the case. The requests for these declarations were all refused, and exception duly saved.

At the request of the defendant the court made a special finding of facts, which substantially followed the pleadings and testimony as set out above. The court also found that plaintiff tendered to defendant the checks, and demanded payment of the sum of $1,000 on each of them, being the amount of each of these checks. The court further found that the National Bank of Commerce and the Mechanics' National Bank to which banks the checks had been paid by defendant, now are and at all the times mentioned were solvent; that the defendant has not been damaged by plaintiff's failure to discover prior to July 5, 1905, the fact that the endorsements were not the endorsements of Hawkins and Bedford.

There was a separate finding as to the facts connected with each of these two checks but we have put them together here, as they are practically the same in each case, save as to names and dates and the bank through which payment was made. The court in conclusion found in favor of plaintiff and assessed his damage at the sum of $2,290 and costs, being the principal of the several notes, with interest thereon from July 8, 1905, the date when the suit was instituted. Exception was saved to this finding and a motion for new trial filed within due time, overruled and exception saved. An appeal was duly prayed to this court, a bond being waived by the plaintiff.

REYNOLDS, P. J. (after stating the facts).—In spite of the multitude of reasons assigned why a motion for new trial should have been granted, thirty-eight such grounds being set forth in the motion, and these grounds for new trial being repeated under nine headings in the assignment of error in this court, these nine assignments being subdivided into numerous subassignments, the propositions involved in it are really very simple and very few. The first proposition involved is, the pass book having been returned at stated periods, showing the balance of the account in favor of plaintiff on the books of the bank at those dates, whether its receipt and retention by plaintiff, together with the checks charged against him without objection constituted the rendering and acceptance of an account stated, and whether the non-action of plaintiff thereon for several years after receiving this balanced account, which included the two checks in controversy, as well as the checks, presented such a state of facts as, making it an account stated, would drive plaintiff into a court of equity to open it up, or compel plaintiff, the account stated having been set up in the answer as a defense, to meet that defense, not by a general denial in his reply, but by setting up his equitable defense to the account stated by way of

reply, if he desired to open up the account on any grounds upon which an account stated can be attacked. In brief, it is claimed that the court, sitting as in the trial of an action at law, is precluded from opening up that account. It is true that the authorities treat this transaction between the bank and its customer as a debit and credit account, its customer the creditor, the bank the debtor. In very many cases these pass books and checks returned to the depositor by the bank with the accounts balanced, are treated as accounts stated, the depositor not making timely objection, but we have found no case, and have been referred to none in which, in a case such as the one at bar, the party has been thrown out of the law court and driven to chancery to recover payment of a check, carried into the pass book account and covered by the pass book. The case so frequently referred to and much relied on by the very learned counsel for appellant, of Kenneth Investment Co. v. Bank, 96 Mo. App. 125, as holding that the receipt and retention without objection for a considerable time of the balanced pass book and cancelled checks, constitutes an account stated, is a case in which, while this court held that these accounts between the bank and its customer so rendered constitute accounts stated, when retained without objection to the account as rendered, still the court permitted that same account to be attacked and its untruthfulness shown and its error corrected in an action at law. It is true that no point appears to have been made that the case was on the wrong side of the court, but it is apparent that it was tried as an action at law. It is true that after defendant set up the rendition of the account, that is, the return of the pass book with the account balanced and of the checks cancelled, plaintiff replied that the balances were incorrect in that defendant had incorrectly charged plaintiff with amounts drawn out on forged checks. But that did not appear to change it into a suit in equity to open up and set aside an account for fraud—it was proceeded upon as

an ordinary action at law, not tried before the court, it is true, but before a referee in the first instance, as in any other action at law. The necessity of such a reply as in Kenneth Investment Company case was obviated in the case at bar by the amended petition, which distinctly sets up the fact of the payment of these forged checks, charges they were forged and, averring that they were wrongfully charged to plaintiff, demands judgment for them. That is practically all that the reply in the Kenneth case did—beyond a general denial, which was also interposed in the reply in this case. So that Kenneth Investment Co. v. Bank is no authority for the proposition that in the case at bar plaintiff should, by way of reply, attack the balanced pass book as an account stated, and go into equity to open up the account. We hold that under the pleadings in this case, it was open to plaintiff to challenge the payment of these checks, without being driven to the equity side of the court to do so.

A feature which does distinguish the Kenneth case from the case at bar is, that it was a case in which a clerk of plaintiff, one of its confidential agents, was the one who, by the means of forged checks, concealed by him from the company (plaintiff) had drawn a large amount of money on account of the plaintiff from the bank. He was the one through whose hands the pass book and the returned checks came from the bank to the plaintiff in the case. That is not the fact in this case. The question we are here to determine is, was it such negligence on the part of plaintiff in failing to discover the forgery of the signatures of the payees on the checks, as to throw on him and not the bank the ensuing loss? We think not. The case of Wind v. Bank, 39 Mo. App. 72, and the Kenneth Investment Company case, supra, set out the law of this State as fully and as clearly as any others and they are recognized as correct announcements of our law. Without quoting either at length, it is sufficient to say that they hold

that estoppel founded on negligence should not work injury to the depositor unless it appears that his negligence has occasioned special damage to the bank. That of course assumes there was negligence. In the case at bar the trial court found there was no negligence, and we concur in that view.

Counsel for appellant call our attention to the case of Leather Manufacturers' Bank v. Morgan, 117 U. S. 96, and say that they hope the court will read that at length, if not already familiar with it. Following the suggestion of counsel, a reading of that case and a consideration of it shows us that it is not very sharply in point or authority in a case of this kind. The facts there as to the relationship of the parties are not as in this case. The forger in that case was the confidential clerk of plaintiff. The pass book and the checks went through his hands to plaintiff. Furthermore its doctrine on the point here at issue is expressly rejected by our court in the Kenneth Investment Company Case, see l. c. 146. Reading the Morgan case, however, we find it refers to the case of Bank v. Whitman, 94 U. S. 343. Turning to this latter case we find that it is almost parallel in its facts with the case at bar. In the Whitman case the Supreme Court of the United States states the question to be this: "Can the payee of a check, whose endorsement has been forged or made without authority, and when payment has been made by the bank on which it was drawn upon such unauthorized endorsement, maintain a suit against the bank to recover the amount of the check?" It will be observed that this practically states the question before us for adjudication in this suit. Further along in the case it is recited that the testimony in it is to the effect that the bank, after the payment of the check on which the endorsement was forged, made its weekly statement to its customer of deposits received and payments made, returning among the checks the one on which the endorsement of the payee was either forged or unauthorized, as having been

paid on the twenty-second of the month prior to the turn-
ing in of the statement of the balance for the month and
showing that in this statement the amount of this draft
was entered to the credit of the bank and charged to the
depositor.   The customer or depositor in this Whitman
case was a Mr. Spinner, and the person to whose order
the draft was made and whose name had been either
forged or affixed without authority was a Mrs. Kimbro.
We give these names so that in quoting hereafter, it
will be understood what position the parties occupied
in the transaction.   The court states that there is no
suggestion in the evidence that either the bank or the
depositor, its customer, knew that the endorsement of
the payee was unauthorized.   We are to assume, says
the court, that the bank would not knowingly subject
itself to the dangers and liabilities resulting from mak-
ing payment to one not authorized to receive payment.
We assume, also, said the court, that the bank would not
ask the depositor to give it credit for a payment that
the bank knew to have been illegally made, and that the
bank would not attempt to deceive its depositor into the
belief that the pretended endorsement was a real one.
"It comes to this, then," says Mr. Justice Hunt, who de-
livered the opinion, ' 'that, upon a settlement of accounts
between them, a credit was by mistake allowed to the
bank to which it was not entitled.   The law is, that
neither party is to be benefited or to be injured by the
mistake.   The bank must refund the amount by handing
over the sum, or by crediting the same to Mr. Spinner
in his next account.   Mistakes in bank accounts are
not uncommon.   They occur both by unauthorized or
pretended payments, as well as by the omission to give
credits for sums deposited.   When discovered, the mis-
take must be rectified, and an ordinary writing up of a
bank-book, with a return of vouchers or a statement of
accounts, precludes no one from ascertaining the truth
and claiming its benefit.   [Story, Eq. Pl., secs. 799-801;
Story, Eq. Jur., secs. 523, 527; Buchlin v. Chaplin, 1

Lans. 443; Burne v. Hone, 2 Barb. 487; Bullock v. Boyd, 2 Edw. 293.] We cannot perceive that such a mistaken recognition of the validity of the payment of this check can create an additional or different contract between the bank and the owner of the draft." Continuing, the opinion disposes of another proposition as to who are the real parties in interest, also presented in this case, under the contention against permitting Hawkins, Bedford and plaintiff to testify, and its discussion on this is so illuminative that we trust we will be pardoned for quoting at some length. Mr. Justice Hunt says: "It is further contended that such an acceptance of the check as creates a privity between the payee and the bank is established by the payment of the amount of this check in the manner described. This argument is based upon the erroneous assumption that the bank has paid this check. If this were true, it would have discharged all of its duty, and there would be an end of the claim against it. The bank supposed it had paid the check; but this was an error. The money it paid was upon a pretended and not a real endorsement of the name of the payee. The real endorsement of the payee was as necessary to a valid payment as the real signature of the drawer; and in law the check remains unpaid. Its pretended payment did not diminish the funds of the drawer in the bank, or put money in the pocket of the person entitled to the payment. The state of the account was the same after the pretended payment as it was before.

"We cannot recognize the argument that the payment of the amount of a check or sight draft under such circumstances amounts to an acceptance, creating a privity of contract with the real owner."

It will be seen how thoroughly this case is in line with Kenneth Investment Co. v. Bank, 96 Mo. App. 125, heretofore referred to and how aptly it fits the facts in this case, in disposing of two of the propositions made, first, the proposition that the plaintiff is estopped from

claiming credit for the amount represented in these two checks by reason of their having been paid on forged endorsements, and of the other proposition made, that by the payment of the checks on a forged endorsement, the man who committed the forgery and endorsed his name on the check became a party to it and was therefore a party to the contract involved in this action, and that his death had shut off the other parties, the real drawer and payees of the checks, from testifying. Incidentally it as well as Bank v. Morgan is in point on the propositions advanced by defendant, that the receipt of the balanced pass book and checks and their retention without objection, drove plaintiff over to the equity side of the court, if he desired to open up that so-called stated account. The strictness with which the National courts preserve and enforce the distinction between actions at law and suits in equity, renders it impossible to suppose that the Supreme Court of the United States would have tolerated, much less decided on elaborate discussion, an action brought at law, which should have been relegated to the chancery side of its courts.

Taking up the question of the competency of witnesses, it is to be noted that in this case at bar, Penn at no time was a party to the transaction. His effort to make himself so by his forgery, which has been proven in this case, as we have seen, does not make him so, and the effort to shut out the testimony of the real payees of the checks on the ground that they were privies in contract with Penn under circumstances of this kind, is so far-fetched that we are somewhat surprised that it is advanced by counsel of the eminence of those in this case. Neither Hawkins nor Bedford are parties to this action; nor are they parties to any contract whatever with Penn. The forging of their names by Penn surely did not make them co-contractors. [Bank v. Whitman, supra.] Plaintiff stands on a somewhat different footing. Some of his transactions were with Penn; he loaned through him, and sent him the checks. But we can,

as the trial court probably did, discard all of his testimony as to dealings with Penn and not affect the result.

The claim is made that it was negligence on the part of plaintiff to lie by for nearly five years before making any demand on the bank for correction of the account by crediting back to him the money which had been drawn out on the two checks. With hardly an exception the cases cited by counsel for defendant in support of their argument are those in which the forgery was committed and the fraud covered up by an employee of the depositor or customer of the bank, either by a secretary or confidential clerk, or an officer, or other agent, in case of a corporation. In such cases, an examination of the checks returned and of the entries made would have disclosed to the depositor the error in his account with the bank. Negligence was imputed in such cases, sufficient to bar recovery. This case, however, is entirely different. The return of the checks to the plaintiff carried no information to him whatever that the signatures of the payees of the check were forged; on the contrary he had no reason whatever to suppose that they were other than genuine signatures of the payees. It is a fundamental law of commercial paper, including bank checks, that every endorser guarantees the genuineness of the preceding endorsements. The very fact that the defendant paid these checks was an assurance on which the plaintiff had a right to rely that the defendant bank had assured itself of the genuineness of every one of the preceding endorsements before it paid the check. To hold otherwise would sap the very foundation of the law of negotiable paper. The check came into the hands of this plaintiff with the signature of the payee endorsed on it; under that was the signature of Penn, or of the firm of Penn & Sallee; that guaranteed the signatures of the payee; under that the signature by endorsement of the Bank of Callaway County, at Fulton, by its presence, guaranteed the genuineness of both of

the preceding endorsements. This was followed in one check by the endorsement of the National Bank of Commerce of St. Louis, and in the others by that of the Mechanics' National Bank of St. Louis, and following that was the acceptance of these endorsements as genuine by the defendant bank itself. So that there was nothing whatever to put any prudent man on inquiry as to the genuineness of the first endorsement or any succeeding one, and the plaintiff was no more bound to know that the first endorsement was genuine than was the defendant bank, in fact not as much so, for the bank defendant was the final party, the one on whom the check was drawn. More than that, counsel for defendant themselves took the testimony of very many witnesses, resident and evidently prominent citizens of Fulton, every one of whom testified that down to the very day of his suicide, the reputation of Penn in that community was of the very highest character, not only as a good citizen but as a man of pecuniary responsibility, so that if plaintiff had gone to Fulton and inquired into the character of Mr. Penn, every word that he would probably have heard or would have been likely to have heard there would have tended to have thrown plaintiff off his guard and would have led him to believe that the endorsement guaranteed by Penn was a genuine one made by the payee of the check. Defendant introduced this class of testimony for the purpose of proving, as its counsel stated, that any inquiry on the part of plaintiff would have shown him the forgery and that it was his duty to have gone to the payee and ascertained from him whether or not the endorsement was genuine, as also to have gone to the records to see if his deeds were of record. Not only do we decline to take this view of it, but the effect of the testimony on us is exactly opposite. In the first place, plaintiff was under no obligation to hunt up these men; he had abstracts, certified to by Penn, showing that they had title to the land on which

137 App.—12

the loans were made, and that his deeds were of record. He had the originals of the deeds of trust stamped as having been duly filed and recorded, he had the notes, all transmitted to him by a man, who, according to the testimony brought out by the defendant itself, occupied a position of high social and business standing in his community. There was therefore nothing whatever to put him or any prudent man on his guard, or to suggest to him that the endorsements on these checks were false and fraudulent, and forgeries. To our minds the testimony introduced by defendant instead of helping defendant is directly against it and makes for the plaintiff in furnishing him the very fullest and most complete possible reason for not making further inquiry, or any inquiry for that matter, as to the genuineness of the endorsements of the payees of the checks. So that with the account balanced in the book and these checks returned to him, the signatures of all the endorsers on the checks guaranteed by three banks and by a man of the highest standing in his community, plaintiff cannot be charged with any negligence whatever in not discovering the fraud perpetrated upon him and the bank sooner that he did. As soon as he had any cause for suspicion of the honesty of Penn, he took the most prompt and vigorous steps to put the bank (defendant) in possession of the facts which had come to his knowledge and to put the bank in a condition where, at that time, it could have amply protected itself against any loss by a resort to the preceding endorsers.

The point made as to the petition failing to aver demand or tender of the notes may be technically correct, but its omission is not sufficient cause for reversal. There was testimony from which a demand and tender may be inferred. Moreover, filing the suit was in itself a demand. The interviews of Mr. Sale with the president of the defendant bank had no purpose other than to advise him that he was there ready and willing to turn over the checks, which he then had with him; his in-

terview was solely directed to secure repayment; the conduct of the president was enough to show that a formal demand would then have been unavailable—and no one is required to do a useless thing.

On consideration of the whole case, we see no reason to disturb the finding of the trial judge, which is entitled, at least in a case of this kind to the same consideration that we give to a general or special verdict of a jury. On the undisputed evidence in the case, there is no ground for going into equity to surcharge and falsify accounts as evidenced by the pass books. Both sides, practically, if not directly, admit the forgery on the drafts or checks, so there was no question of correction or opening up of accounts involved. On all the evidence in the case the judgment is for the right party and is affirmed. All concur.